No. 26,329.

THE STATE OF KANSAS, ex rel. PAYNE H. RATNER, County Attorney of Labette County, *Plaintiff,* v. E. E. BARKER, County Clerk of Labette County, *Defendant.*

### SYLLABUS BY THE COURT.

OFFICERS—*Ouster—Intoxication in Public—Evidence.* In an original proceeding to oust from office the county clerk of Labette county, the evidence is examined and held to sustain the charge that, in a public place within the state, the defendant was in a state of intoxication produced by strong drink voluntarily taken.

Original proceeding in quo warranto. Opinion filed December 5, 1925. Judgment for plaintiff.

*Payne H. Ratner,* county attorney, and *Charles H. Cory,* assistant county attorney for the plaintiff; *L. E. Goodrich,* of Parsons, of counsel.

*E. L. Burton,* of Parsons, *Frank H. McFarland* and *James E. Smith,* both of Topeka, for the defendant.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in quo warranto to oust E. E. Barker from the office of county clerk of Labette county. It was brought in the name of the state on the relation of the county attorney, under our statute, R. S. 60-1609 *et seq.,* providing for such procedure. The statute, so far as necessary to be set out, reads as follows:

"Every person holding any office of trust or profit, under and by virtue

Officers, 29 Cyc. p. 1406; 50 L. R. A., n. s., 912; 22 R. C. L. 568.

of any of the laws of the state of Kansas either state, district, county, township or city office, who shall . . . in any public place within or without the state be in a state of intoxication produced by strong drink voluntarily taken . . . or who shall commit any act constituting a violation of any penal statute involving moral turpitude, shall forfeit his office and shall be ousted from such office. . . ."

The petition charged two causes of action: *First,* that on a day named defendant was in a state of intoxication produced by strong drink voluntarily taken in the streets of the city of Parsons, and in the stairway, halls and the office of a justice of the' peace, in a certain office building in such city; *second,* that on a day named defendant took a woman, not his wife, to a certain office in an office building in Parsons with the intent to compel her by force and menace to be defiled, and did by force attempt to compel her to have sexual intercourse with him; in violation of R. S. 21-427, a statute involving moral turpitude. Defendant's answer denied all charges of misconduct. After the issues were joined this court appointed Hon. S. C. Bloss, of Winfield, as its commissioner to take the testimony and to make findings of fact and conclusions of law thereon and to report the evidence, together with his findings and conclusions, to this court. The commissioner has taken the testimony and made his report. His findings of fact and conclusions of law are as follows:

"FINDINGS OF FACT.

"1. Defendant E. E. Barker at all times herein was county clerk of Labette county, Kansas. Prior to February 1, 1925, his general reputation for being a sober, moral, law abiding citizen was good.

"2. Said E. E. Barker is thirty-two years old; is married, and with his wife resides in Oswego, Kan. Prior to his election as county clerk he had resided in or near Parsons, Kan., for fifteen or sixteen years. He attended the public schools of Parsons and was graduated from Pittsburg Normal, or Teachers College. Thereafter, he taught school for a time, acting as director of athletics in various high schools. He enlisted in the navy, and after the war was engaged in welfare work. He was appointed by Governor Allen to work in the employment bureau, and engaged in such work for about four years.

"3. While in charge of the employment bureau, his office was in the Kimball building, a two-story business building located at the northeast corner of Main and Eighteenth streets in Parsons, Kan., in the principal business district of the city. The north entrance to the second story is a flight of stairs from Main street. There is a wide hall running east and west with offices on the north and south sides, entered from the hallway. Mr. Malsed, a single man, a friend of Mr. Barker, who was also a justice of the peace, had two offices on this floor, the entrance to the front office being directly from the Main street stairway. From the main hall, or interior court, there is a

hall leading south to the back of the building connecting with a stairway to Eighteenth street on the east. Mr. Malsed's offices were on the west side of the north and south hallway. On the east of this hallway were dressmaking rooms and living rooms of Mrs. Laura E. Lonnecker, which she had occupied for some years. On the east side were the free employment offices. The Kimball law offices were on the north of the east and west hall, and opening from this hall were several other offices occupied by professional men and others. The halls and stairways were lighted and open to the general public at all times. [Mr. Malsed used both rooms as offices, although the south room was also used as sleeping rooms; books and other office fixtures were kept in the south office as well as in the north office. Your commissioner made an inspection of these offices.]

"4. Mr. Barker attended the Kansas Day banquet at Topeka January 29. 1925; then went to Kansas City to attend to some business with the United States Veterans Bureau. He arrived in Parsons Saturday afternoon, January 31, 1925, and stayed that night with Mr. Malsed in his rooms in the Kimball building, one of the offices being Mr. Malsed's sleeping quarters. He had Sunday dinner with his wife at Mrs. Hassel's, a sister of Mr. Malsed.

"5. Mr. Barker was about town at various places from three in the afternoon Sunday, February 1, 1925, until 4:30 or 5 o'clock of that day, when he went to Judge Burton's law office in Parsons, and consulted with him about the law relating to the appointment of deputy assessors, until about 6:30, when he took Judge Burton to his home in the east·part of the city about eight or ten blocks from his office.

"6. Mr. Barker then went to Mrs. Hassel's for supper. After supper he made various trips and errands about town, and later met Mr. Malsed at his office in the Kimball building, and had a talk that took at least thirty minutes about information for the Veterans' Bureau. He then went with Mr. Malsed to Sullivan's drug store, and obtained some laxiated pepsin for his stomach. At this store he met about nine o'clock that evening Miss Watson, Mr. Malsed's stenographer and 'girl.' [Mr. Malsed was engaged to Miss Watson.] Miss Watson asked to be driven to the home of Miss Mae Ashley to get some books she had left there. Miss Ashley had at one time been a teacher in the Parsons public school, but more recently had been doing stenographic work, and had worked some in Mr. Malsed's office. Mr. Barker had a speaking acquaintance with her for about two years. She was of a light complexion and rather above the average in size.

"7. Mr. Barker in his Ford coupé with Mr. Malsed and Miss Watson as passengers drove to Miss Ashley's home. Miss Watson went in and came out with Miss Ashley, and the four of them went in the car from Miss Ashley's in the southeast part of town north through town to Miss Watson's home, where she left the party. Mr. Barker, Mr. Malsed and Miss Ashley then continued west across town to the Katy Hospital, where Mr. Malsed left the car to visit his father. Miss Ashley remained in the car while Mr. Barker went in to speak to Mr. Malsed's father.

"8. Mr. Barker with Miss Ashley only in the car drove from the hospital to Main street, and thence west beyond the city limits some distance, as much as a half mile, then returned to the business district, buying gasoline at a

station on the way in. Mr. Barker upon his examination stated (transcript, p. 187) he 'did not remember the details as to the route taken.' He drove along Main street past the entrance to the Kimball building, turned south on Eighteenth street and parked his car near the alley and near the Eighteenth street stairway of the Kimball building.

"9. Mr. Barker and Miss Ashley left the car, and Mr. Barker went up the Eighteenth street stairway, followed by Miss Ashley, who desired to get some books from the office. They went into the Malsed office. No one else was there. The doors were then locked. This was shortly after ten o'clock Sunday evening, February 1, 1925.

"10. Some six or seven minutes after Mr. Barker and Miss Ashley entered the Malsed office Miss Ashley came out of the north and south hall followed by Mr. Barker. As Miss Ashley reached the Eighteenth street stairway Mr. Barker held her arm, and forcibly pulled her from the stairway back to the Malsed rooms. This occurrence, as seen by Mrs. Lonnecker through a glass door from her rooms, was duly described by her in her testimony. She said, referring to Mr. Barker and Miss Ashley:

" 'He kept watching my door, the other door I use. The door I was standing at I don't use. He had hold of her arm. I was watching her expression on her face so much did not notice what step she was on. She was excited. She wanted to go home, and said if he did not turn loose of her she was going to scream, and he kept away from the front of the stairway, and did not get a good hold of her, and then is when he asked her to come back and get her hat. She had her coat on. He said, "Go get your hat," and she said if he did not let loose of her she would scream, and while she was saying that, they came up to the other door of my rooms, and he reached by her and got hold of her with both arms, and he yanked the young lady back up the stairs. I would say very forcibly. Then when she got up on the stairway onto the floor she tried with her other arm to hang on to the banister, and did as long as she could, and she stepped on down then as far as the second stair and braced his feet and pulled her this way, and she hung on to this post as long as she could, and as she turned loose something rolled against the mop- or baseboard. He broke her grip on the stairway, then when he yanked her up to him she started to strike at him with this arm. They were up by my door then, and he got behind her and put both arms around her and pushed her, and at that time they were out of my line of vision going up the hall. . . . I heard him close the door.'

"As to what she heard after Mr. Barker and Miss Ashley were in Malsed's office Mrs. Lonnecker testified as follows: 'I heard voices, and I raised my window to see if I could see any one to call. I heard her yelling at him— more yelling than screaming, and what sounded like chairs being knocked around.' Mrs. Lonnecker went out into the hall, picked up a button, which was introduced in evidence and which was torn from Miss Ashley's coat. She called the officers.

"11. Mrs. Lonnecker's call for officers was answered by George D. Hodge, a patrolman on the Parsons police force, accompanied by Mr. Ledbetter, as an assistant, about 10:00 or 10:30 Sunday night, February 1, 1925. On arriving at the Kimball building the officers went to the Malsed office. Mr. Led-

better went to the north door and Mr. Hodge to the south door. Mr. Hodge knocked on the door two or three times, and they did not open it. He pushed on the door and it came open and he went in; the lights were not on and it was dark in the rooms. He used his flashlight and observed Mr. Barker standing up on a table or desk, reaching up. Miss Ashley was standing in the doorway between the two rooms. In reply to the officer Mr. Barker said, 'He was doing nothing,' and got down, then the officer got up on the table where Mr. Barker had been standing, to make a search of the premises, and found nothing. Miss Ashley said: 'Oh, I am so glad you came. I could not hold out much longer.' As she said this she was standing in the doorway between the rooms and was crying; had her coat on and did not have her hat on.

"Mr. Barker went to the front part of the Malsed offices and talked with the assistant officer, Mr. Ledbetter. Mr. Barker did not have his coat on; his hat was off. Officer Hodge found some empty bottles in the room. While Officer Hodge was in the room making a search Mr. Barker attempted to make an escape by way of the front stairway. Mr. Barker stumbled or fell on the front stairway down to the first landing. He got up and went east and around on to Eighteenth street toward his car. He was pursued by Officer Hodge. Mr. Ledbetter took charge of Miss Ashley.

"12. When the defendant Barker got away from the Kimball building and was going down the middle of Eighteenth street, he was met and recognized by Mr. Paul Pryor. Pryor called to Mr. Barker and he stopped. Barker said: 'I have not done anything.' Pryor said: 'What are you running about?' Barker said: 'I want to call the judge.' Pryor took hold of Mr. Barker's arm and took him back to Officer Hodge. At this time and place defendant Barker was excited, his face was flushed, and there was a smell and odor of intoxicating liquor on his breath. His voice was not natural, his tongue was thick. Officer Hodge took defendant Barker to the Parsons police station, and arrived there about 10:50 p. m.

"13. Mr. Barker knew that Officer Hodge was policeman at the time he fled from such officer from the Kimball building, and down Main street and around on Eighteenth street, where he met Mr. Pryor, another acquaintance. He was also personally acquainted with Mr. Ledbetter, who was assisting Officer Hodge in making investigation at the Kimball building.

"14. While defendant Barker was in the Malsed offices, in the stairway and hallway of the Kimball building, and on Main street and Eighteenth street, prior to the time he was met by Pryor and between the hours of 10 o'clock p. m. and 10:50 p. m. on the evening of Sunday, February 1, 1925, in Parsons, Kan., he was in a drunken or intoxicated condition, his face was flushed, he perspired freely on a cold night, his tongue was thick, and he did not speak his words plainly, and did not have a clear idea as to what he wanted to do. His body was limp and his step was unsteady. The odor of whisky or alcohol or intoxicating liquor was strong upon his breath; he was not capable of conducting himself in an orderly or decent manner, and this lack of capacity was due to the use at about that time of intoxicating liquor. The physical functions and energies of Mr. Barker were impaired.

"15. The evidence does not show that Miss Ashley had been using intoxicants at the times herein referred to. In the opinion of your commissioner,

Miss Ashley was not taken forcibly to the Kimball building. She seems to have gone of her own accord. What occurred in Mr. Malsed's rooms and in the hallway, as described by Mrs. Lonnecker, was the result of a quarrel, in which the conduct of the defendant Barker was that of a drunken or intoxicated man.

"16. About a week after February 1, 1925, Miss Ashley left Parsons, Kan., and went to Missouri, where she was seen by Mr. Malsed in Kansas City. Miss Watson about two weeks after said February 1, 1925, left the employment of Mr. Malsed and went to Rich Hill, Mo.—Miss Ashley's home—and visited there with Miss Ashley; then the two girls went to Kansas City. The state has endeavored to obtain service of subpœna on Miss Ashley, and has endeavored to obtain her testimony, but without success.

"17. Sunday, February 1, 1925, the defendant, E. E. Barker, while in the hallway and stairway of the Kimball building, and on Eighteenth and Main streets, Parsons, Kan., was in a state of intoxication, produced by strong drink voluntarily taken; said hallway and stairs were at the time above stated each public places; said streets were at all times public places."

[Clauses in brackets were added by the commissioner on motion to revise.]

"CONCLUSIONS OF LAW.

"1. Your commissioner concludes that the defendant, E. E. Barker, county clerk of Labette county, Kansas, on the first day of February, 1925, was in a public place in the city of Parsons, Labette county, Kansas, in a state of intoxication produced by strong drink, voluntarily taken, in violation of section 60-1609, Revised Statutes of Kansas, 1923, and for such cause should be ousted from the office of county clerk of Labette county, Kansas.

"2. Your commissioner concludes that the evidence is not sufficient to establish the second count of the petition herein."

Plaintiff has moved for a judgment of ouster based upon the commissioner's report, the defendant has moved to be discharged, the evidence has been abstracted and the cause has been presented by briefs and oral arguments.

Plaintiff argues that this court is bound by the findings of the commissioner to the same extent that it would be bound, in a case that came to this court by appeal, by the findings of a jury or trial court, and should not set them aside if there is any substantial evidence to sustain them. This is an erroneous view. In original cases in this court, the court tries the facts as well as determines the law. When a commissioner is appointed, his findings of fact, if questioned, are advisory only. (*State, ex rel., v. Anderson*, 117 Kan. 117, 118, 230 Pac. 315, and cases there cited.) Naturally, if no objection is made to the commissioner's findings—if the parties in effect concede that the commissioner's findings are correct under the evidence—there may be no occasion for this court to go back of the findings and examine the evidence, but it has ample power to do so, for the findings

ultimately allowed to stand must be the findings of this court. And there may be situations, involving the personal appearance and demeanor of witnesses upon controverted questions, or the personal inspection of premises, which the commissioner can see and the members of this court cannot, where we should be slow to set aside a finding of a commissioner based thereon, even though the printed record inclined us to do so. Defendant argues that since the commissioner has found in his favor on the second cause of action, and the state has concurred in that finding, the second cause of action goes out of the case, but this is not necessarily true. We are no more bound by the commissioner's finding on the second cause of action than by his finding on the first. There is this difference, however. The state, by its counsel, has conceded that the evidence is not sufficient to support the second cause of action; but even that concession is not necessarily controlling on the court. We are inclined to the view that counsel for the state have conceded too much. Possibly both the commissioner and counsel for plaintiff felt bound by the allegation in the petition that defendant's conduct was in violation of R. S. 21-427, which makes it an offense to take a woman "against her will" for immoral purposes, and by the evidence that Mae Ashley went voluntarily into the building. The error in this is that the state was not so limited. If the evidence showed that the conduct of defendant violated any penal statute involving moral turpitude, judgment should have been against defendant on this count. In view of the conclusion we have reached on the first cause of action, and the attitude of plaintiff's counsel as to the second cause of action, we shall treat the latter as in effect withdrawn.

We now turn our attention to the first cause of action and the evidence and argument pertaining thereto. It is contended by defendant that the evidence does not show that defendant was drunk, and some rather fine reasoning is indulged in and authorities cited as to what constitutes drunkenness. Many witnesses, including experienced police officers, at least one of whom was personally friendly to defendant, testified that he was drunk—so much so that he was not competent to care for himself nor a fit person to be upon the streets—that this was evidenced by his general appearance and conduct, by a strong odor of intoxicating liquor upon his breath, by a flushed face, thick tongue, inability to articulate distinctly, incoherent speech, inability to find or read numbers in the telephone directory, and inability to walk straight. With evidence of this

State, *ex rel.*, v. Barker.

character and his inability later to remember what transpired that afternoon and evening, as disclosed by his own testimony, we need not go into fine distinctions as to what stage of inebriety constitutes drunkenness. The evidence justifies a finding that he was drunk, under almost any definition of the term that may be found.

It is next argued that, even if he were drunk, there is no evidence that the drunkenness was produced by intoxicating liquor voluntarily taken. There is evidence that the drunkenness was produced by intoxicating liquor, for the peculiar odor thereof was strong upon his breath. There is no direct evidence that the liquor was taken by him voluntarily; but when drunkenness is caused by intoxicating liquor, it is so frequent that the liquor is voluntarily taken—so seldom that the liquors get into the system in any other way in sufficient quantity to produce drunkenness—that in the absence of evidence to the contrary, the natural and reasonable conclusion is that the liquor was voluntarily taken.

It is next argued that defendant was not in a public place, that the stairs and halls of the Kimball building and the rooms of the justice of the peace therein were in no sense a public place, especially of a Sunday evening. A public place is any place that the public is invited or permitted to go or congregate. (See definitions of public places in Words and Phrases, 1st and 2d series.) A place may therefore be public at one time and not at another. The stairway and halls of the Kimball building were open and lighted all the time and the public permitted to use or occupy them at any time. There is nothing in the evidence to disclose that the office of the justice of the peace was a public place except during business hours. The streets of the city were, of course, at all times a public place. Defendant was in the stairway and hallway of the Kimball building and on the public street, and hence was in a public place within the meaning of the statute.

The findings and conclusions of the commissioner pertaining to the first cause of action set out in plaintiff's petition are adopted and approved by the court, and judgment will be entered for the state in accordance therewith.